If it please the court, good afternoon. My name is Stephen Volker. I represent plaintiffs and appellants of Backcountry Against Dumps, et al. I'm here to urge the court to reverse the ROD, or ROD, for two reasons. First, it violates substantive standards set forth in the Federal Land Policy Management Act, or FLPA. And second, the Environmental Impact Statement prepared for approval of the project, both the right-of-way and the plan amendment, violates the National Environmental Policy Act. Our FLPA argument parallels the arguments made by Mr. Somerville, which the court just heard. Rather than belabor that in detail, I would like to point out some salient standards set forth in applicable law, which should help inform the court's analysis of what are the applicable standards that BLM had to meet here. The setting is that FLPA directs that the Secretary shall manage the public lands in accordance with the land use plans developed under FLPA, under 43 U.S.C. 1712. That quotation is from Section 1732A. Pursuant to that statutory authorization and direction, BLM has adopted regulations, which are found at 43 CFR Section 1610.5-3, which similarly directs that all resource management actions shall conform to the approved plan. In order to ascertain whether the two project approvals in this case conform to the approved plan as required by the statute and the implementing guidelines, the court needs to examine what were the standards applied by the agency when it made its determinations as reflected in the ROD. One finds that the standards set forth for Class L lands were not applied by BLM and were in fact violated by BLM when it approved the project. Let me explain why. According to the CDCA plan, Class L is intended to, quote, protect sensitive, natural, scenic, and cultural resource values. Class L lands are, quote, managed for generally lower intensity, carefully controlled, multiple use of resources while ensuring that sensitive values are not significantly diminished. In our record, that would be Excerpture Record 1437. And that basic distinction between a Class L land, which is subject to this overarching restriction on use that it must not significantly diminish sensitive resource values, is the key distinction that BLM failed to observe and implement in this case. Let me elaborate. The CDCA plan further fills in the interstices here. It states that consumptive uses are allowed on Class L lands, quote, only up to the point that sensitive natural and cultural values might be degraded, ER 1445. So it's not a casual reference to this distinctive restriction. It's the driving distinction that appears in multiple locations throughout the operative plan and the other documents that help the court understand what the plan was doing. And we find that contrary to those clear distinctions, when BLM approved the right of way and the plan amendment, and I'll explain why the plan amendment doesn't begin to unravel the Gordian knot, it failed to understand its own standards. And it didn't apply them. And had it applied them, it would have been, under this record, required to disapprove this project. It couldn't be clearer on this record. Let me explain why I say that. The EIS admits that this project will significantly diminish the site's sensitive values, both as to cultural values, vegetation, wildlife, and scenery. And I'll provide the court with several examples of where the EIS concedes that there is a significant diminishment or degradation of those resources. In our record at ER 275, the EIS admits the project's construction and operation and maintenance would result in permanent, unavoidable adverse impacts to cultural resources as important as those eligible for the National Register of Historic Places. As a result, quote, as a result of the conversion of a natural desert landscape to a landscape dominated by industrial character, that's at ER 275. With respect to sensitive vegetation, the same EIS explains, quote, permanent impacts to sensitive vegetation, communities, and special status plant species due to long-term land scarring following project decommissioning 30 years hence would result due to the large impact area and the long recovery time for desert vegetation. That's at ER 278-280. Likewise, with regard to wildlife, the EIS admits, quote, permanent unavoidable impacts to suitable unoccupied peninsular bighorn sheep habitat, burrowing owl burrows, and foraging habitat, special status raptor and migratory bird species due to collision, and special status bat species due to collision. All would have permanent, unavoidable adverse impacts. With regard to scenery, the EIS is even more graphic. It explained that virtually every significant scenic resource in this area, and this is an outstanding area. You have the Hukumba Wilderness Area to the south, the Coyote Mountains Wilderness to the north. You have an area of special environmental concern nearby, and you have Anza-Borrego State Park to the west. So it's surrounded by some of the great west's most outstanding scenic and wildlife and cultural resources imaginable. The EIS says, quote, adverse and unavoidable impacts from the conversion of a natural desert landscape to a landscape dominated by industrial character. That's at ER 274-275. The 400-foot high turbines, quote, would be prominently visible, and the introduction of industrial character and structural visual contrast would result in substantial adverse effects on the panoramic and highly scenic vistas currently available to backcountry recreationists that access the volcanic hills and the Hukumba Mountains west of the project site, the Hukumba Mountains and wilderness south of the project site, and the Coyote Mountains north of the project site. It goes on to say, quote, the resulting cumulative visual impact would be significant and unavoidable. That's at ER 553-554. Quote, the resulting visual change would substantially degrade the existing visual character or quality of the site and its surroundings, ER 554. In sum, the project would cause a, quote, cumulatively considerable impact to the surrounding vistas individually and collectively, close quote, again, at ER 554. So here we have a cavalcade of significant, permanent, unavoidable adverse impacts and degradation, admittedly so, to all of the sensitive resource values that were carefully cataloged when BLM examined the site. So far, so good. It identified the resources, realized they were sensitive, made a Class L determination designating those resources for the heightened level of restrictive zoning and protection that they're entitled to. And then threw those standards out the window when it decided to lean over backwards to approve this project without applying the very standards that it had labored to make sure were included in this plan, standards which are enforceable under its own regulations pursuant to statutory direction. So this is not a case where BLM was given discretion by the statute to balance. In some cases that's true. Certainly with regard to areas designated M or I, which are consumptive use oriented, BLM has broader discretion to make those judgment calls. But not so with regard to those lands designated C, controlled, nor those lands designated L, limited use. Instead, the plan provides a clear direction as to what the standards are. And BLM's job here was to apply the standards, but it never did so. Now BLM has advanced three or four arguments to excuse its failure to apply its own plan standards. All of them fail. First, it argues that the ROD directs energy generation where resources are available. And here there were winds that warranted study for potential wind generation. Therefore, it follows that the area should be developed for wind. Not so. The ROD restricts energy development to those locations where it is, quote, environmentally acceptable, close quote, ER 1276. So what is environmentally acceptable? Well, acceptable is defined by the plan's standards. And the way to get to that ultimate decision in an informed way is to do an EIS. That's why the guidelines require before solar or wind energy development takes place in class L lands, as in other areas, that an EIS must be done. Now, the next argument the government advances, well, the court should defer to BLM's interpretation. Not so. The law of this circuit is that where a land managing agency's decision is, quote, plainly inconsistent with the plan at issue, close quote, that agency interpretation should be disregarded. The agency doesn't sit as a court determining legal interpretation of the statutory and regulatory guidance. This court has that job. That's the Oregon Natural Resources Council fund. So what's plainly inconsistent here? Okay. There are, with regard to those four sensitive resource values, wildlife, cultural, scenic, and vegetation, the EIS admits that there will be significant, unmitigable, permanent impacts. And in the case of the visual resources, they would cause substantial degradation. So those are inconsistencies, plan inconsistencies, that BLM was constrained to reconcile with its approval of this project. But it didn't reach that point because it studiously circumvented any consideration of the very plan standards that would foreclose approval of this project. Its next argument, which the court has adverted to previously, is that, well, it solved all the problems by amending the plan. Well, here are the problems. There are a number of them. In the amendment of the plan, the... You don't even challenge that, do you? Yes, we did in our administrative appeal. We did in the complaint. I didn't see it in this. It didn't seem like to me that you say the plan was not properly adopted. You didn't say that they didn't follow the correct procedures for adopting it. So, therefore, it seems to me that your challenge of the plan amendment is pretty minuscule. Well, I... I mean, you can argue what the plan amendment does. But I read what you said, and I don't find any place in there where you challenge the plan amendment on its proper adoption, on the using the correct procedures, even what's in the plan. I thought I was going to give you the same question I gave counsel. Thank you, Your Honor. And before I get too deep into this argument, I wanted to reserve five minutes to rebuttal. I realize I'm almost out of time now. Well, you're about done. Yes. Well, with regard to the court's point, we did challenge the plan amendment insofar as it's been interpreted by BLM to allow approval of the right-of-way. And we also pointed out that both the right-of-way and the plan amendment were based on EIS that had deficiencies, which are developed fully in our briefs. Well, I'm more than willing to talk about the things you talked about as to whether they adequately examined the impacts on big orange sheep, as to whether they failed to consider the adverse visual impacts of many of the projects, as to the effects of the infrasound and the low-frequency noise from the project. I think those are there, even as to the consideration of alternatives to the wind energy. I'm willing to talk about that as well, but you haven't got there. What we're really talking about yet is all the background information that I think we kind of understand, which I thought we kind of demonstrated in the last questioning. But I don't have anything here that suggests you're fighting the plan amendment at all as to these particular issues. May I respond? You bet. Okay, thank you, Your Honor. I mean, you've got 420. You can do whatever you want to do. Well, I guess I would say, first of all, we did challenge the plan amendment as a technical matter, both in the administrative appeal and in our complaint, and in, of course, our opening and reply briefs in this case. The primary argument is that we have a mishmash. We have a purported amendment which doesn't make sense in the context of the plan standards. It never repeals any of the plan standards. It never purports to make any findings with regard to the plan standard issues of whether there was a significant diminishment of sensitive resource values or a degradation of them. Instead, what we have is a claim by the government that the CDCA plan was amended to provide, quote, permission granted to construct wind energy facility proposed Ocotillo Wind Energy Facility, close quote. Not so, not so. It's set forth in the final subpunct EIR record at page 121 in the EIS, but it was never adopted. What was adopted instead, and this appears at ER 109 and 116, the adopted amendment merely says, quote, amends the CDCA plan to identify 10,151 acres as suitable for wind energy development, close quote. And as has been indicated, the mere fact that it's suitable means that wind energy development of some kind might take place after an EIS is done and after a determination is made whether, based on that fully informed information that's developed through the EIS, the wind energy development that might be proposed would conform to the plan standards for the Class L classification. That didn't occur here. There was no determination that the Class L standards were satisfied. And what we have is at a minimum an inconsistency between a purported amendment, which doesn't actually grapple with the inconsistencies between a perhaps intent to give this project a pass and the fact that the plan standards simply wouldn't allow it given the EIS's determinations that this would significantly diminish all of these sensitive resource values. The other argument that the government has made is that the guidelines allow development of wind energy in Class L areas if and that it may happen if there's an EIS. And our point is it doesn't say shall be allowed. It says may. And the idea here is that, of course, you'd want an EIS. These are sensitive areas. And if the EIS tells you that the plan standards are going to be violated, then that proposed project, that specific project could never be approved under this plan. So on remand, if the court is persuaded that there were mistakes made, it's up to the government ultimately to decide what are the applicable standards. It looks to the statutory guidance. It looks to the public comments. It decides what this plan should provide. But whereas here it's already determined that a Class L site should not be developed if it would cause significant diminishment of its sensitive resource values or their degradation, it can't approve that. If BLM wants to amend the plan further and do further environmental review to support such an amendment, that's up to BLM. We're not attempting to usurp its statutory discretion. But what we are doing is attempting to hold it to the standards it has adopted in a formal public manner based on an EIS and what it's told the public it was going to do. So if I could reserve my less than a minute, I would please report. Thank you. May it please the court. I'd like to pick up right where Mr. Volker left off when he said that if BLM wanted to amend this plan, it could, but if it wanted to change the class designation, it could, but it would have to go through the process. Because I think that that point underscores how formalistic the back country's challenge is here. We know that BLM amended the plan to say this area is suitable for wind power. And Mr. Volker just told you that BLM could have said this area is suitable for wind power and it's now designated class I or class M. If it had done that, their FLPMA claim would be gone. There'd be nothing left to their FLPMA claim. There would be no basis for them to argue you can't do this in class L because BLM would have said, well, this is no longer class L. BLM didn't do that here because it did not believe that this wind power was inconsistent with class L. But it went through the process of doing the plan amendment. It went through the process of identifying all of the plan amendment criteria, the public notice, the decision making to amend the plan to say this area is suitable for wind. Maybe it should have included the magic words and it's also now class I. It didn't think it was necessary to do that. But if that's all we're talking about on that FLPMA claim is missing those magic words, the agency's intent, the agency's reasoning and its path is clear here. And the missing magic words should not be determinative of the outcome. But counsel, I guess the big problem that I have is if the amendment to the plan simply suggests this project can be done here and now I'm supposed to apply the standards of a class L to this particular situation, given all of the things that he cites in the EIS where the government and the project coordinator suggests that this will be significantly diminished, how it can ever reach class L? Well, there's a distinction between saying that an impact is significant or substantial and saying that this will significantly diminish class L lands. And the EIS is thorough and it's comprehensive and it's forthright in identifying where there will be impacts and that some of those impacts will be significant. I think with respect to cultural values, most of what the EIS says is that there will be impacts despite the mitigation, that the tribes consider to be significant. But the EIS discloses significant impacts, but that's different than saying that class L resources will be significantly diminished over the whole 5.9 million acres of class L within the desert protection area. Where does the DOI even suggest that they're using the class L standard? I mean, if you read the EIS, you read the ROD, they're suggesting you haven't even used the standards. The standards you're using are the class I standards. The ROD in a couple of places... You don't have the particulars? I mean, I can read the ROD again. No, I do. I made long lists of particulars here and I should use my list. I'm sorry, your honor. That's okay, I can read it. The record of decision makes findings with respect to the impacts of the project on multiple use classes. The record of decision and the FIS specifically address impacts on multiple use classes, on the various other resource categories. And in discussing multiple use classes, it explains the way that BLM interprets its plan. And it says, class L says uses wind energy as permitted, significant diminishment. Resources have to be managed to the extent practicable or consistent with multiple use balancing. So the ROD puts that gloss on the language of the plan because that's how BLM interprets its plan. It's a multiple use plan. It calls for balancing. The plan guidelines and the plan elements talk about how that balancing is supposed to be accomplished. I have no other question on that. I'll take the hint, your honor. Thank you. May it please the court, Svann Brand Erickson in for Ocotillo Express. Picking up exactly where Mr. Haig was just at, for this case, the relevant discussion from the record of decision in which they discuss the application of the land use guidelines to this project appears at PSER 39 through 43. And based on that analysis, what the agency did is it went through and applied each of the guidelines, looked at the guidelines as they applied to this project. Now, a number of the guidelines don't differentiate across the land classes. For example, the Native American values guideline applies the same to all four land classes. And that's where, in this case, it's at ER 111. The comment in the record of decision in discussing the Native American values piece says cultural resources are preserved and protected to the extent practicable. That's where that extent practicable that we've heard in both these cases comes from. That is also, you know, both Backcountry Against Dumps and the Kishan tribe cited to that, that standard comes out of the Native American plan element. That word, extent practicable, is a characterization of the plan element protecting Native American values wherever prudent and feasible. If you look at PSER 39 through 43, as it discusses the guidelines, it does note guidelines that differentiate between the land classes and discusses class L in that context where a guideline does differentiate. Now, there's not, you know, a robust separation out of that criteria, of this significantly diminished criteria in the ROD, and that's because the agency interpreted the plan, its decision criteria, as what's found in the plan elements, and it applied it in that way. I just close with an observation that much of this discussion about how to interpret the plan has occurred at a pretty esoteric level. And as that plan was actually applied to this individual project, if you look at the modifications that were made to this project to reduce its footprint and reduce its impacts, those were the essence of multiple-use management. They're steps that may not have been taken if this was on class I lands. And those steps are what represent the agency's application of the criteria for class L to this project through substantially reducing its scope to reduce its impact on other uses and values. Thank you. Mr. Volker? Excuse me. Thank you, Your Honor, very quickly. We have addressed those arguments in our reply brief at pages 9 to 10. In summary, BLM and OCOTIL quote the plan's energy production and utility corridors element found at ER 1517 to 1520, which admonishes BLM to, quote, avoid sensitive resources whenever possible, close quote. The problem with the reliance now placed on that language is that this language does not direct BLM to disregard class L's prohibition against uses that significantly diminish such resources. It is rather general hortatory language that does not discriminate, let alone repeal, the various class designations that govern the type and degree of permissible uses. The plan and its elements must be construed to harmonize and give effect to all of their words rather than create conflicts between them, and we cite the Native Ecosystems case, 418F3rd at 960. The other point here, Your Honor, is that BLM and OCOTIL rely on the plan's direction that, quote, all land use actions with any multiple use class delineation must meet the guidelines given for that class. That's at ER 1438. But they ignore the plan's preceding sentence, which states, quote, the class designations govern the type and degree of land use actions allowed within the areas defined by class boundaries, close quote, ER 1438. This language recognizes that land use actions must, in addition to meeting the requirements of the class designations that govern the type and degree of land use actions allowed within the areas defined by class boundaries, also meet the guidelines given for that class. So it's a two-step process. First, you look at the class restrictions. If you meet those, then you apply the guidelines. But you don't even get to the guidelines until you've determined that the class applies. It's like the analogy between a general plan, which may designate an area for a certain intensity or density of use, and then if it meets that criterion, you move on to whether the zoning allows it. Here, we have a government that jumped ahead to the final determination whether its guidelines might be construed to allow this project without ever passing through the threshold determination whether the plan standards themselves allowed it. And they don't. Thank you, Your Honor. Thank you, Mr. Volker. We thank all counsel for the argument. That concludes the oral argument calendar, and we are in recess until 8 p.m.
judges: Farris, Bybee, N.R. Smith